# West Jellico Coal Company v. Norton Coal Mining Company, et al.

(Decided December 14, 1926.)

## Appeal from Hopkins Circuit Court.

1.  Mines and Minerals—Evidence Held to Show that Loss to Mine from Cave-in was Not Due to Withdrawal of Support by Company Operating Lower Mine.—Evidence that mining company stopped mining operations because unprofitable, and that trouble in its mine was due to want of proper timbering and entry of water into mine, held to show that loss resulting from cave-in was not due to withdrawal of support by company operating lower mine.
2.  Mines and Minerals—Lower Mining Company, Making no Timely Complaint of Blasting Operations in Upper Mine, Held Not Entitled to Damages Therefrom.—Company operating lower mine, knowing of blasting operations in upper mine, but making no timely complaint, held not entitled to recover for alleged damages from blasting.

WHEELER & HUGHES and CHARLES G. FRANKLIN for appellant.

C. J. WADDILL and JOHN T. EDMUNDS for appellee.

Opinion of the Court by Commissioner Hobson—Affirming.

The West Jellico Coal Company holds a twenty-year lease on number 14 vein of coal in certain lands in Hopkins county. This vein of coal is about 65 feet below the surface of the ground. The Norton Coal Mining Company owns an interest in number 11 vein of coal in the same land. This vein is about 130 feet below number 14. About 1920, the West Jellico Coal Company put in some entries in vein number 14, and operated this mine until March 1, 1923, when it ceased operations. Previous to this the Norton Coal Mining Company had been mining coal extensively in vein number 11, and had opened a number of entries and rooms in that vein. In April, 1923, the roof of the entries in vein number 14 fell, the pillars gave way and the mine was practically destroyed, as the cost of restoring it would amount to more than the cost of making a new entry. The West Jellico Coal Company then brought this suit against the Norton Coal Mining Company to recover for the destruction of its mine, alleging that this was due to the fact that the latter com-

pany, by its operations, had taken away the support underneath vein 14. The allegations of the petition were denied by answer. By consent of parties the case was transferred to equity, as it involved complicated accounts. A large amount of proof was taken. The court being in doubt, entered an order for the appointment of a special commissioner, one expert in mining, to examine the premises and report the conditions and what had brought about the trouble. By consent of parties John A. Garcia, a mining engineer of experience, was appointed as commissioner. He thoroughly examined the premises and reported, in substance, that so far as he could judge the trouble in the upper mine was not due to a sinking of the strata on which the upper mine rested. The circuit court, on the commissioner's report and on all the evidence, entered a judgment dismissing the plaintiff's petition with costs. The plaintiff appeals.

The defendant, by its answer, pleaded as a counterclaim that the plaintiff had not conducted its mining operations with ordinary care and had used large quantities of dynamite in blasting the coal out of the solid bank and had thus inflicted a great injury on its mine below. This was denied by reply and on final hearing the circuit court dismissed the counterclaim with costs. The defendant prosecutes a cross-appeal on this branch of the case.

The record presents simply a question of fact. This is peculiarly a case where weight should be given the finding of the chancellor on a question of fact, for the local judge, living in the community, knows much more about local coal mining conditions than members of this court living in other parts of the state, and he also knows better the value of the expert testimony of the local witnesses. According to the proof for the plaintiff the trouble in its mine was discovered some weeks after the mine shut down in March, and it consisted in a settling of things throughout the mine. According to the proof for the defendant the floor of the plaintiff's mine was clay. Sixty-five feet above the roof of the mine was earth or broken sandstone through which water could percolate easily. The floor of the mine was wet. The coal in the bank was so wet that gunpowder could not be used for blasting. When clay gets wet it gets soft. According to the proof for the defendant the soft clay allowed the pillars to sink into it and this brought down the roof of the mine. No timbers had been put up anywhere. It was

peculiarly a roof which should have been carefully timbered. The defendant's proof by a number of expert witnesses sustained the finding of the special commissioner, which was, in effect, that the trouble was due to water upon the floor and the failure to properly timber the mine. The weight of the testimony is that the 130 feet of space between vein 14 and vein 11 was much of it solid limestone, which had not given away or sunk perceptibly. There was evidence that in October, 1922, what is known as a "creep" occurred in the rock about these mines, and this continued for some months. The plaintiffs insist that this movement was due to the excavation in vein 11. The defendant insists that it was due to the large quantity of dynamite shot on the solid in vein 14. The weight of the evidence rather sustains the latter view.

No great amount of damage was done the lower mine. The proof is conclusive that at the time no complaint was made that an improper amount of dynamite was used or that it was fired improperly. The claim for damages on this score was not heard of until after this suit was brought.

On the whole case the court concludes that the trouble in the upper mine was due to the want of proper timbering and the water that got in the mine. It also concludes that the defendant, well knowing what was going on in the upper mine and making no timely complaint, its counterclaim was properly dismissed.

The proof conclusively shows that the coal in vein 14 is very inferior and has in it much material that must be eliminated before it can be sold. To eliminate this material costs so much that it does not pay to operate on this coal when the price of coal is low. When the mine was opened in 1920 the price of coal was up, but the price had gone down before March, 1923, and the operation of the mine was stopped because it could not be profitably operated at the price of coal at that time. The operation was not stopped on account of any trouble in the mine, and its operation can never be resumed profitably unless the price of coal shall go up again. The proof, therefore, shows that the loss which fell on the plaintiff was due to other causes rather than the acts of the defendant.

Judgment affirmed on the original and on the cross appeal.